FILED
2006 Apr-07  AM 09:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

LAURA BEARD,

      PLAINTIFF,

v.                         CASE NO. CV-05-J-627-NE

84 LUMBER COMPANY,

      DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 22), evidence in support of said motion (docs. 23 and 24) and memorandum in support of its motion (doc. 25), to which the plaintiff has responded by submitting evidence (doc. 29) and a response in opposition to said motion (doc. 30). The defendant thereafter filed a reply (doc. 31). Having considered the pleadings, evidence and memoranda of the parties, the court finds as follows:

## I. Factual Background

The plaintiff was employed by defendant until she voluntarily resigned due to alleged sex discrimination. The plaintiff brings suit under Title VII, 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981a for sex discrimination/disparate treatment, retaliation, and constructive discharge.

The plaintiff was recruited to work for defendant by Jim Hougas because she had experience with remodelers and contractors.[1] Hougas depo. at 286-287. She was hired as a contract sales representative about thirty (30) days prior to the defendant's store opening in Huntsville, in March 2003. Plaintiff depo. at 23, 41, 89, 91; exhibits 2 and 3 to plaintiff depo. The plaintiff was to be paid a weekly salary plus 11% of gross profit. Plaintiff depo. at 44-45. At some point she went to outside sales, which pays a higher commission with no salary guarantee. Plaintiff depo. at 91; exhibit 8 to plaintiff depo.; Hougas depo. at 7; Garrison depo. at 141. However, some outside sales people had guaranteed salaries. Plaintiff depo. at 92; *see also* Brooks depo. at 47-50. In November 2003, her guarantee was reinstated because her sales were lagging. Exhibit 6 to plaintiff depo.; declaration of Pat Bove (compensation analyst for defendant), at ¶ 10; plaintiff depo. at 243. She again received a salary guarantee from November 2004 through March 2005, which was after she filed her first EEOC charge. Exhibits 7 and 8 to plaintiff depo.; Bove declaration, ¶ 11; plaintiff depo. at 252-258.

The plaintiff asserts she was discriminated against by defendant based on her sex. Plaintiff depo. at 100. Her evidence of such discrimination is as follows:

---

[1]During plaintiff's employment, Hougas was the store manager. He has since become an outside salesperson. Hougas depo. at 6-7; Lemons depo. at 285-286.

1. When she first started, the plaintiff was told she had to wear khakis but all the men wore blue jeans, so she started wearing jeans and was never told to stop. Plaintiff depo. at 101-102, 109.

2. When the store opened, defendant got a box of telephones and not all of them worked.  Hougas depo. at 308-09.  Plaintiff was told they had a shortage of telephones and she would get one.  Plaintiff depo. at 101.  There were phones that did not work, but plaintiff could have used any other phone in the store.  Hougas depo. at 309-310.  Many of the salespeople did not have phones when the store first opened because they were shipped only half of what they were supposed to receive.  Jolley depo. at 18.  The plaintiff was paid $75.00 a month for reimbursement for using her cell phone, but asserts her cell phone bills were much higher than this.[2]  Plaintiff depo. at 107-108.  Everyone got a phone within a week of the store opening.  Jolley depo. at 19.  Jolley does not think the plaintiff went two months without a phone. *Id.*, at 125.

3.  Everyone but plaintiff had an automatic plug in calculator.  Plaintiff depo. at 103.  However, the store was only shipped half of its order for calculators.  Jolley depo. at 18.

---

[2]The only evidence of the plaintiff's phone bills is the plaintiff's testimony.  Plaintiff depo. at 101.  No copy of a phone bill, which plaintiff alleges to have been $1,800.00, has been produced to the court.

3

4. The plaintiff complains that all her belongings were removed from her office and thrown in the office of Liz Gambrell, another female salesperson, so that William ("B.J.") Jolley, a male salesperson, could use plaintiff's office when he came into the store.  Plaintiff depo. at 112, 116.  Jolley was the assistant manager from when the store opened until December 2003.  Jolley depo. at 13.  He transferred to another store, then returned in May 2004 as a salesperson.  *Id*., at 14.   He spent his first month training J.W. Williams to be co-manager, and asked plaintiff if he could use her office because it was directly across from Williams'.  *Id*., at 53.  Plaintiff said she had no problem with this, so Jolley moved her things to Gambrell's office.  *Id*., at 53-54.   When plaintiff complained, Jolley said he understood and her things were replaced in less than a week.  *Id*., at 55-56.   Jolley then moved into Stan Stephens' office.  Plaintiff depo. at 113, 119.  Jolley never said he took her desk because she is female, but this is what she assumed.  *Id*., at 121.  According to Jolley, when he was co-manager, he got along well with the plaintiff and tried to help her call on new customers.  Jolley depo. at 21-22.  They resolved the office space issue on their own as well.  *Id*., at 57.

5. The plaintiff claims male salespeople were allowed to sell at lower profit margins so they could offer lower prices and make sales she could not.   Plaintiff depo. at 124-125. She spoke with Hougas about this.  Hougas depo. at 313-316.  She

states salesman Robert Garrison was allowed to bid a job cheaper than she could, and that Hougas told her she could not bid it any cheaper.  Plaintiff depo. at 125-126.  She was also told she could not reduce the profit margins to keep customer Ken McDaniel Homes.  Plaintiff depo. at 128.  Hougas testified that the plaintiff asked him about reducing the prices and he said Ken McDaniel's margins were already low.  Hougas depo. at 315-316.  Hougas stated that the salespeople could sell at whatever margin they wanted, but since plaintiff had asked about it, he told her what he thought.  *Id*., at 316.  Jolley also had a sale vetoed by Hougas because the profit margin was too low.  Jolley depo. at 126.  Hougas agrees plaintiff had the highest margins.  Hougas depo. at 349; 444.

In fact, the gross profit percentages for each of the salespeople on each of the sales varied greatly, as did their rates of compensation.  *See* exhibits D-S to Bove declaration.  The August 2004 evaluation of Jim Hougas, the store manager, shows that plaintiff was selling at a higher profit margin than anyone else in the store, and that only she and Liz Gambrell had an 18% profit margin, while the male salespeople all had a 15% profit margin.  *See* exhibit E to declaration of Brian Kelly (Director of Human Resources).   An evaluation of Hougas in June 2004 shows all of the salespeople with the same profit margin goal.  *See* Exhibit F to declaration of Kelly.

6.   The plaintiff also complained to Hougas that her deliveries were not going out on time and she thought it was intentional because she is female.  Hougas depo. at 313; 378, 387-388, 399.  However, this was an ongoing problem for the store and plaintiff's delivery issues were never any worse than anyone else's.  Garrison depo. at 140; Jolley depo. at 100, 102-103; Jason Williams depo. at 90; Hougas depo. at 373-377.  Donnie Lemons, area manager, addressed this problem on a store wide basis because he did not think there could be a delivery issue with only one salesperson.[3]  Lemons depo. at 183, 187.  He did not know plaintiff was claiming her deliveries were untimely because of discrimination.  *Id*., at 187-188, 194.  He heard complaints about deliveries from male salespeople at the store too.  *Id*., at 191-192; *see also* Brooks depo. at 34-35.

7.   The plaintiff asserts that customers were taken away from her because of discrimination.  Plaintiff depo. at 133.  She claims B.J. Jolley and Jim Hougas agreed without her knowledge to take M&M Construction and Cash Properties away from her.  *Id*., at 138-140.  Hougas admits this was discussed, but states he went to plaintiff and she was fine with it.  Hougas depo. at 320-321, 324-327.  According to Jolley, these were customers that the plaintiff had not sold to in more than six months.  Jolley

---

[3]Donnie Lemons took over as area manager in January 2004 from Roger Payne.  Lemons depo. at 25, 28.

depo. at 58-59; 64-65, 75-76.  The plaintiff admits that when an account has not been sold for six months, it is considered fair game for other salespeople to get.  Plaintiff depo. at 142-143.  Thus, when Jolley became a salesperson, he and Hougas worked to create a list of potential customers.  Jolley depo. at 79-80.  Of the twenty-five or so on the list, three had been customers of plaintiff.  *Id*.  She complained to J.W. Williams, who told her she needed to be more like Liz Gambrell and that it was plaintiff's own fault she let it happen.[4]  Plaintiff depo. at 138-139; Williams depo. at 141.  According to Williams, Gambrell was straightforward while it was often hard to tell what was actually a problem for the plaintiff.  Williams depo. at 143-147.

The Cash Properties account was reassigned to plaintiff from Jolley.  Plaintiff depo. at 140-142.  Jolley tried to get her Champion Home and Remodeling account, but the owner of Champion said if he was going to buy from defendant, he would do so through plaintiff.  Plaintiff depo. at 145; Jolley depo. at 59-60.  Hougas stated that the Slyman account was reassigned from plaintiff to Garrison because Slyman wanted to communicate through email and no one but Garrison could figure out the store email, although Garrison did not think he got this account solely because he had

---

[4]Jason "J.W." Williams became the co-manager in May 2004.  Jolley depo. at 14-17.  He also worked as a coordinator for the plaintiff during this time.  Williams depo. at 33.

email access.[5]  Hougas depo. at 258-259; Garrison depo. at 23-24, 134-136.  Rather, he knew the framer, who approached him.  Garrison depo. at 134-135.  The Shannon Pullen account was also removed from plaintiff after Pullen told Hougas he did not want to work with her anymore.[6]  Hougas depo. at 267-269.  Todd Adcock was reassigned from plaintiff to John Brooks because Adcock requested a different salesperson.  Hougas depo. at 281-282; Brooks depo. at 20-23.

The plaintiff took an account away from Brooks which he later got back because the plaintiff was not servicing it.  Brooks depo. at 42-45.  Brooks thought the plaintiff was a good salesperson.  *Id*., at 66.  He also related that Hougas was enthused about hiring the plaintiff.  *Id*., at 66-67, 74.  He never saw anything to suggest that Hougas did not like the plaintiff or that he had a negative attitude toward her.  *Id*., at 73-74.

The plaintiff complains that the D.R. Horton account, which could have been the defendant's largest account, was taken away from her and given to a male

---

[5]According to Brooks, there were only two computers at the Huntsville store that will get email, in Garrett Sanders' office and in the manager's office.  The other computers could show messages only.  Brooks depo. at 60.  Only in the last five or six months have they been able to get email at all.  *Id*., at 61.  However, Garrison had his own laptop and could receive email on it.  *Id*., at 61-62.

[6]There is conflicting evidence as to whether Pullen was an actual account, or was a subcontractor for someone else.

salesperson.[7]   When she complained to Lemons about this, he responded that he

thought she was sharing that account with Robert Garrison.  Plaintiff depo. at 176,

178.  Hougas asserts that he took the account from plaintiff because she lacked the

training, knowledge, communication skills and technical skills to handle the account.

Hougas depo. at 80, 87-88, 119-120, 128, 167. Plaintiff had had issues with improper

orders on other projects and suffered from a lack of knowledge and disorganization.

McGee depo. at 96-98;  Jolley depo. at 26-27.

The plaintiff asserts she heard D.R. Horton was going to build in Huntsville

and got in  touch with Kerri Ditwiler, the buyer for D.R. Horton.[8]  Plaintiff depo. at

218-220; *see also* McGee depo. at 366.  She set up a meeting with Ditwiler, Donnie

Long, herself and Hougas.[9]  Plaintiff depo. at 221-222; Long depo. at 12.  D.R.

Horton was already doing business with defendant, but not with the Huntsville store.

Plaintiff depo. at 223.  John McGee was an engineered lumber specialist and was also

working to get the account for defendant, as he had known the D.R. Horton people

for a long time.  Hougas depo. at 193-195; McGee depo. at 63, 67-69, 73, 130-131,

---

[7]D.R. Horton is the largest home builder, and hence the largest customer, in the United States.  Long depo. at 42; Jolley depo. at 158.  This does not mean it is always defendant's biggest customer.  Jolley depo. at 158.

[8]Kerry Ditwiler was vice president of operations over purchasing.  Long depo. at 24.

[9]Donnie Long was an area manager for D.R. Horton during the relevant time period. Long depo. at 8.

202; Long depo. at 37, 40; *see also* Sanders depo. at 71.    The plaintiff met with D.R. Horton about once a week for a year trying to get the account.  Plaintiff depo. at 226. Just when she was about to get a purchase order, Hougas pulled her off the account and gave it to Robert Garrison.  Plaintiff depo. at 227-228, 231-232; Garrison depo. at 23.  Hougas told Garrison the account had not yet been assigned to anyone. Garrison depo. at 38-39.

Donnie Long decided to purchase through defendant in Huntsville because plaintiff was getting him information faster than defendant's competitors and she seemed to want their business more than anybody else.  Long depo. at 16, 25.  He had no concerns about her technical knowledge.  *Id*., at 19.  He was unaware anyone from D.R. Horton ever complained to defendant about plaintiff.  *Id*., at 22.  However, at the time the plaintiff was removed from the account, the decision to use defendant was not final and no purchases had been made.  *Id*., at 25, 42; Hougas depo. at 175-176; McGee depo. at 99-100.

The impetus to remove plaintiff from the D.R. Horton account came from Lemons.  Hougas depo. at 147-148; 181.  McGee called Lemons and said D.R. Horton was concerned with the individual on the account.  Lemons depo. at 39-40; 155.  McGee was actually asked during a meeting with Donnie Long and Lane Hollis

if the defendant could handle the account.[10]  McGee depo. at 149-152.  According to Long, Lane Hollis made this comment because defendant's Huntsville store had not been open very long.  Long depo. at 35.  It had nothing to do with plaintiff's abilities.  *Id*., at 35.

McGee told Lemons he had concerns about the plaintiff's ability because she lacked industry and product knowledge.  McGee depo. at 15-16, 25, 189, 194, 196, 240.  *See also* Jolley depo. at 29-30; Leathers depo. at 58, 102-103.   McGee told Hougas he talked to Lemons about whether the plaintiff could handle the account due to problems in the bidding process and her lack of experience.[11]  McGee depo. at 381-387.  McGee did not mention any concern over the fact that plaintiff is a woman.  Lemons depo. at 52.

The defendant was having trouble with quotes during the bid process for D. R. Horton due to issues of getting the right material quoted and problems with the

_____

[10]Lane Hollis was vice president of construction for D.R. Horton and Donnie Long's boss. Long depo. at 23.

[11]Throughout McGee's deposition, plaintiff's counsel asked McGee if he thought plaintiff was "[j]ust a dumb woman" or  "a woman without a clue"  McGee depo. at 333, 393.  Each time, McGee specifically stated he would not say that.  McGee depo. at 333, 393.  Plaintiff's counsel asked, "this woman salesperson just didn't have a clue; right?" to which McGee replied, "When you put it in that text, I disagree with that."  McGee depo. at 351.  McGee was also asked "You had it out for Laura Beard, didn't you?" to which he responded "No, no, that's not true at all." McGee depo. at 498.  Plaintiff's counsel also asked Garrison if "it ever occurred to you that Laura Beard might be treated differently because she is a woman?" to which Garrison responded, "No."  Garrison depo. at 161.

blueprint takeoffs, which D.R. Horton required.  McGee depo. at 160-163.  McGee knew the plaintiff could not do blueprint takeoffs.[12] *Id*., at 32-34, 53.  Defendant had hired someone to do the takeoffs for plaintiff and he did a terrible job.  Hougas depo. at 178-180.  Leathers knew the plaintiff paid someone else to do takeoffs for her.[13] Leathers depo. at 46.  If the plaintiff had known how to do takeoffs, a lot of mistakes made would have been caught by her before the bid process.  McGee depo. at 237-240.  Additionally, McGee believed the plaintiff lacked understanding of what it took to build a house.  *Id*., at 51-53.  She did not seem able to quote D.R. Horton for the products they wanted from the vendors they were already using in Birmingham.  *Id*., at 314, 338-342, 344-347, 437-438.  Additional support would not have helped the plaintiff because she just lacked the necessary experience.  Garrison depo. at 117-118. The account required "blueprint takeoffs" and plaintiff did not have the experience to do them.  Hougas depo. at 165-166, 171-172.  Long told the plaintiff that the

---

[12]This is a means by which a salesperson can determine from construction blueprints the estimated materials needed for a project.  Examples given during the various depositions included determining how many 2x10's or how many sheets of subfloor would be needed for construction.  The salesperson, relying on the blueprints and his or her takeoff, could then estimate what materials to order for a job and quote a bid based on that estimate.

[13]John Brooks, another salesman at the store, testified that he offered to show the plaintiff how to do takeoffs three or four months after the store opened.  Brooks depo. at 18.  Jolley testified that, to the best of his knowledge, the plaintiff was not very good at doing takeoffs from actual blueprints.  Jolley depo. at 22, 24.

takeoffs needed to be right and if they could not be done correctly, D.R. Horton might have to go elsewhere.  Sanders depo. at 65-66.

After talking to McGee, Lemons called Hougas and asked if he thought they had the right person on the account.  Lemons depo. at 60-61, 65-66.  McGee later suggested to Lemons that maybe the account should be shared, because it was so large and he knew this had been done in the past.  McGee depo. at 174, 183-184, 225.  Because plaintiff complained about the reassignment, Hougas then called Lemons to see what he thought of Garrison and plaintiff sharing the account.  Lemons depo. at 125-126, 137.  Lemons said it was up to Hougas.  *Id*., at 137-138.  He later heard Garrison got the whole account because Garrison did not want to share.  *Id*., at 144, 323-324; Hougas depo. at 228, 231-232, 430; Garrison depo. at 56-57.  Hougas told Lemons that the plaintiff did not have the product knowledge or blueprint takeoff ability needed, while Garrison had greater product knowledge, more experience and the ability to do takeoffs.  Lemons depo. at 157, 172.

At a later meeting, Hougas introduced Robert Garrison to Long as D.R. Horton's new salesperson.  Long depo. at 28; Garrison depo. at 40, 69.  When Long inquired why plaintiff was no longer on the account, Hougas told Long that Garrison had more technical knowledge and he wanted them to have the best service possible.  Sanders depo. at 36-37; Lemons depo. at 47, 393; McGee depo. at 153, 232; Hougas

depo. at 139; Long depo. at 28.  Long said he was looking for the most qualified person to handle the account and did not care if it was the plaintiff or anyone else. Garrison depo. at 69.  Hougas never mentioned anything about the plaintiff being female.  Long depo. at 45.  Long had been satisfied with plaintiff as D.R. Horton's salesperson.  McGee depo. at 154.  However, no one from D.R. Horton asked to have plaintiff back.  Lemons depo. at 356.

The day after they were introduced, Garrison went back to Long and said he had been put in that position by Hougas and if D.R. Horton wanted plaintiff back, he understood.   Garrison depo. at 48.   Long was not pleased about plaintiff being removed because he did not like being surprised and told him defendant it was getting the account because of the plaintiff.  Long depo. at 29-30, 33.  Garrison concedes that receiving the D.R. Horton account was probably due to some sort of favoritism, but does not think it was because he is male.  Garrison depo. at 182.  Rather, he believes it was due to his extensive experience.  *Id*.  The plaintiff admits Garrison has twenty to twenty-five years experience with building materials, but asserts that does not make him a better salesperson.  Plaintiff depo. at 238; *see also* Garrison depo. at 16. She had never handled an account as big as D.R. Horton before.  Plaintiff depo. at 239.

8.   The plaintiff further alleges she was denied the support of a qualified coordinator because she is female.  Plaintiff depo. at 188, 191.  She states that she was assigned Chris Jones because she is female.  *Id*., at 207.  Jones had previously been assigned to Gambrell, until she complained about him. *Id*.  Then Gambrell was assigned Kevin Leathers, and plaintiff got Chris Jones.[14]  *Id*., at 208.  The plaintiff was also assigned Garrett Sanders, but defendant reassigned him when she complained.[15]  Hougas depo. at 53-54, 347.  Sanders had no prior experience as a coordinator, but Leathers helped him.  Hougas depo. at 54-55; Sanders depo. at 17-18, 24-25.  The plaintiff had problems with numerous coordinators.  Lemons depo. at 257-258; plaintiff depo. at 189-190.  However, she does not believe any of them were assigned to her because she is female, but that the group of coordinators she had to go through was because she was female.  Plaintiff depo. at 199-200. Kevin Leathers, who was a good coordinator, was reassigned from the plaintiff to John Brooks and Robert Garrison after their coordinator left because they were generating the bulk of the business.[16]  Hougas depo. at 55-56, 342, 344.  According to Leathers,

---

[14]Chris Jones has since married Hougas' daughter.  They were dating at the time in question.  Hougas depo. at 50-52.

[15]Garrett Sanders is John McGee's stepson.  McGee depo. at 200; Sanders depo. at 10.

[16]Kevin Leathers became a coordinator in May 2003.  Before that, he was a management trainee in another of defendant's stores.  Leathers depo. at 8, 12-13.

all the other coordinators had left, so he was assigned to the salespeople with the highest sales and the other salespeople were given the new coordinators.  Leathers depo. at 13-14, 22-23.  The plaintiff further complains that Scott Glisson was hired to be her coordinator by Hougas with the knowledge that he was not a good coordinator, because she is female.[17]  Plaintiff depo. at 213-215; Hougas depo. at 441; Garrison depo. at 143-144.

9.   The plaintiff told Lemons she was not making any money because of delivery and billing issues.  Lemons depo. at 241-243.  Most of the salespeople complained about losing customers due to billing and delivery issues.  Jolley depo. at 140.  Jolley agrees that Hougas had an issue with plaintiff, but thinks it was because plaintiff went to Lemons to complain about  Hougas.  *Id.*, at 149-151.

Due to her many and varied complaints, the plaintiff filed her first charge of discrimination with the EEOC on June 8, 2004, and an amended charge in March 2005.  Exhibits 4 and 9 to plaintiff depo.  After her first EEOC charge, her problems at work got worse.  Plaintiff depo. at 167.  She told Williams and Lemons that she felt discriminated against based on sex.  *Id.*, at 163-164.  The plaintiff states she has many

---

[17]In her Declaration, submitted as exhibit 2 in opposition to defendant's motion for summary judgment, plaintiff asserts that she had requested Hougas hire Seth James, with whom plaintiff had worked at her previous place of employment, but Hougas hired Glisson instead.  *See* Declaration of Beard, ¶ 11.

complaints of discrimination because all her problems at work were because she is a woman. *Id*., at 166, 169-170.

Although she has a phone number for the corporate headquarters, the plaintiff did not talk to anyone there until after she quit. Plaintiff depo. at 156. During the spring visit, corporate representatives would tour the defendant's store and meet with the salespeople. *Id*., at 172-173. While employed, the plaintiff never mentioned to any corporate representative that she felt like she was the victim of discrimination. *Id*., at 174.

The plaintiff's second EEOC charge asserts that she was forced to quit due to retaliation from her first EEOC charge. Plaintiff depo. at 257, 272. She alleges deliveries to her customers became even later. *Id.,* at 258. The retaliation was by everybody at 84 Lumber. *Id.,* at 258-259. However, other than Hougas, she does not know of anyone who knew of her charge. *Id.,* at 259-260. She has no specifics as to how things became worse. *Id.,* at 270. She told Jim Hougas she was going to resign and he wished her luck. *Id.*, at 281.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).   As the Supreme Court has explained the

summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence
> of an element essential to that party's case, and on which that party will
> bear the burden of proof at trial.  In such a situation, there can be no
> genuine issue as to any material fact, since a complete failure of proof
> concerning an essential element of the nonmoving party's case
> necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23.  The party moving for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrates

the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to

the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the

'depositions, answers to interrogatories, and admissions on file' designate 'specific

facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed.

R. Civ. Pro 56(e).  In meeting this burden the nonmoving party "must do more than

simply show that there is a metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must

demonstrate that there is a "genuine issue for trial."   Fed.R.Civ.Pro. 56(c);

18

*Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  The nonmovant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v.  Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir.1991).

## III.  LEGAL ANALYSIS

Plaintiff asserts that the above facts constitute sex discrimination, retaliation, unequal pay and constructive discharge.  As the court can find no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence.[18] This court must apply the three prong test fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973).  *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981).  First, the plaintiff must establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee.  *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11ᵗʰ Cir. 1997).

---

[18]The elements of a claim of discrimination under 42 U.S.C. § 1981 are the same as a Title VII discrimination claim in the employment context. *See Peterson v. BMI Refractories,* 132 F.3d 1405, 1412 n. 13 (11th Cir.1998).

Assuming the employee meets this burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996). The defendant can feasibly present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted. *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir.1991), *cert. denied*, 502 U.S. 1058 (1992)(quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590. 596 (11th Cir.1987).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff. *Harris*, 99 F.3d at 1083.

20

## SEX DISCRIMINATION

The court may consider only those incidents that occurred no earlier than 180 days prior to June 16, 2004, the date the plaintiff filed her first EEOC charge. *See National Railroad Passenger Corp. v. Morgan*, 122 S.Ct. 2061, 2068-72; 42 U.S.C. § 2000e-5(e). Thus, any allegation of discrimination occurring prior to December 19, 2003 is time-barred. Therefore, the court does not consider the plaintiff's claims of lack of a telephone or adding machine, or being told she could not wear blue jeans, which each occurred at the time the Huntsville location opened, that being March 2003.[19]

As to the remaining claims, the plaintiff meets her *prima facie* burden of proof by establishing that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected classification more favorably. *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000), citing *Holifield v. Reno,* 115 F.3d 1555, 1562-63 (11th Cir.1997). The court has carefully read the plaintiff's and the defendant's evidentiary submissions. The parties do not dispute that the plaintiff meets the first two elements of her prima facie case.

---

[19]The court notes that, even if not time barred, none of these allegations amount to an "adverse employment action." *See e.g., Davis v. Town of Park Lake, Florida*, 245 F.3d 1232, 1239 (11th Cir.2001)

Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action.  *Wideman v. Walmart Stores, Inc*., 141 F.3d 1453, 1456 (11th Cir.1998).

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir.1997).  Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc*., 141 F.3d 1453, 1456 (11th Cir.1998).

*Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir.2000).  *See also* *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir.2001) citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-61, 118 S.Ct. 2257, 2268, 141 L.Ed.633 (1998).  The Court in *Davis* declared that:

> to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances (emphasis in original).

*Davis*, 245 F.3d at 1239 (citation omitted).  Removing the D.R. Horton account from the plaintiff could arguably constitute an adverse employment action because it theoretically affected her income, even though no sale had been made at the time.

The plaintiff asserts that Robert Garrison, a male, was treated more favorably than she because he received the D.R. Horton account.[20]

The court finds that the plaintiff and Garrison were not similarly situated. The evidence establishes before the court is that Garrison had numerous more years experience in building than the plaintiff and could perform tasks that the plaintiff could not do on her own. The court finds no evidence that the plaintiff was treated differently based on her gender. In fact, the court can find no evidence that the plaintiff was treated differently from any other salesperson, male or female, except Garrison, who received benefits no one else in the store did. Plaintiff's allegation otherwise is simply unsupported by the evidence.

Even if the court found that the plaintiff satisfied her *prima facie* case in accounts being removed from her, the defendant presented ample evidence of a legitimate, nondiscriminatory reason, namely that the decision to remove the plaintiff from the D.R. Horton account was a business decision based wholly on a concern that

---

[20]The plaintiff alleges numerous de minimus actions as evidence of discrimination against her. For example, the plaintiff asserts Hougas allowed male salespersons to give away nails and the like to customers. Plaintiff's response at 22. There is no evidence that the plaintiff or the other female salesperson were prohibited from doing the same. The plaintiff also makes numerous allegations of favoritism by Hougas toward Garrison. The court finds the majority of these, such as her allegation that Garrison received commission on house accounts, and that Garrison's delivery charges were reduced, do not assist the plaintiff's gender discrimination claim, as they were just as unfair to the male salespeople in the store. In other words, the other male salespeople were treated identically to the plaintiff in not receiving the same benefits.

plaintiff could not handle the account due to her experience level and product knowledge.  Plaintiff offers no evidence it was due to her sex, other than the fact that she is female.[21]   The defendant decided that the plaintiff and Garrison's abilities were not equal.  Whether this decision was "prudent or fair" is not an appropriate question for this court to decide.  *See Rojas v. Florida*, 285 F.3d 1339,1342 (11th Cir.2002), citing *Damon v. Fleming Supermarkets of Florida, Inc*., 196 F.3d 1354, 1361 (11th Cir.1999).  Rather, plaintiff must prove that the defendant acted with discriminatory purpose.  *Williams v. Motorola,* 303 F.3d 1284, 1293 (11th Cir.2002), citing *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir.1984).   The evidence that D.R. Horton was satisfied with plaintiff as its salesperson does not alter the plaintiff's burden to rebut defendant's claim that assigning Garrison was a business decision.  The plaintiff has failed to show defendant's nondiscriminatory reason was a pretext for discrimination against her based on her gender.

In fact, the plaintiff wants this court to make an assumption that she was the victim of discrimination based solely on the fact that the construction industry is male-dominated. The court is unable to make such broad assumptions based solely

---

[21]The court notes that many of the plaintiff's complaints arise from allegations that her coworkers simply were not nice to her.  Plaintiff depo. at 161.  Rather, they competed against her for accounts.  The court can find no discriminatory action by defendant in its commission based salespeople competing for sales.

on the gender make-up of a particular industry. This is particularly true given that all of the actions about which the plaintiff complains were taken by the same individual who recruited her to come work for the defendant. The plaintiff argues that Hougas favored male salespeople by paying them more, letting them call on her customers, allowing them to sell at lower margins, and by giving away plaintiff's accounts. Plaintiff's response, at 21. These arguments are refuted by the fact that Hougas recruited the plaintiff and provided her with two salary guarantees after her original one expired. Additionally, the defendant has addressed each of the plaintiff's arguments concerning the sales at lower profit margins and giving away plaintiff's accounts. The plaintiff has offered no evidence of how the defendant's nondiscriminatory reasons were pretextual, other than to allege that the construction industry is male dominated.

Furthermore, even if the plaintiff could establish that Hougas had some bias against her, there is no evidence that Lemons had any bias against plaintiff. However, the evidence establishes that Lemons was the one who suggested to Hougas that  he review who should handle the D.R. Horton account.

The plaintiff's arguments are all based on her belief that her work was acceptable and therefore she must have been removed from the D.R. Horton account for some reason other than her abilities. However, the plaintiff must show "not

merely that the defendant's employment decisions were mistaken, but that they were indeed motivated by sex." *Lee v. GTE Florida, Inc*., 226 F.3d 1249, 1253 (11th Cir.2000), citing *Alexander v. Fulton Co.,* 207 F.3d 1303, 1309 (11th Cir.2000).  The court finds no evidence in the record before it that the plaintiff's removal from that account, or any of the other actions about which she complains, were based on her sex.  Thus, the defendant's motion for summary judgment on the plaintiff's claim of sex discrimination is due to be granted.

**PAY ISSUES**

The evidence does not support the plaintiff's argument that male salespeople were paid more.  *See* plaintiff's response at 21-22, 46.  Rather, the facts relied on by the plaintiff support a finding that one male salesperson was given a higher guarantee than plaintiff.  Evidence supports that other male salespeople have not been given any guarantees after their initial one expired, and receive solely commissions based on sales.  The evidence, considered as a whole, demonstrates that each salesperson at the defendant's Huntsville store was given a different guarantee to start.  Hence, some male salespeople were paid more than others.  The court finds nothing discriminatory in the plaintiff's pay structure.

The plaintiff requested and received a second pay guarantee of a weekly draw based on $50,000.00 per year, in November 2003, after she was supposed to be on

straight commission.  Exhibit 6 to plaintiff depo.  After the plaintiff filed her first EEOC charge in June 2004, she received a third pay guarantee in November 2004 based on a $50,000.00 year salary.  Exhibits 7 and 8 to plaintiff depo.  This guarantee expired March 1, 2005, but the plaintiff left her employment with defendant prior to this date.

The court is of the opinion that the plaintiff has failed to produce any evidence that her salary guarantees were in any way related to her gender.  Rather, the evidence supports a finding that every salesperson in the store was given varying guarantee amounts.  The court shall therefore grant defendant's motion for summary judgment on plaintiff's claim for pay differences.

## RETALIATION

The plaintiff claims that she was retaliated against for filing her June 2004 EEOC charge.  Under Title VII, the plaintiff does not have to prove the underlying claim of discrimination in order to establish a retaliation claim.  *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir.1999).   Rather, her opposition to the alleged discrimination is protected if she can reasonably form a good faith belief that the alleged discrimination existed.  *Id*.  However, the facts before this court do not support that the plaintiff was retaliated against for filing her initial EEOC charge.

27

To establish a prima facie case of retaliation for engaging in protected activity, the court must use the *McDonnell-Douglas* burden shifting standard, discussed in detail, *supra*. The plaintiff must show that she (1) engaged in Title VII protected activity; (2) an adverse employment action occurred; and (3) a causal connection between the protected activity and the adverse employment action exists. *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999); *see also Rabinovitz*, 89 F.3d at 487; *Runyon*, 175 F.3d at 868; citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

While the filing of an EEOC charge of discrimination is clearly a protected activity, the plaintiff cannot show an adverse employment action after her first charge was filed. As discussed *supra*, such an action must be demonstrated by an "ultimate employment decision." Here, the plaintiff has failed to establish any adverse change in the terms of her employment following the filing of her first EEOC charge. The D.R. Horton account was assigned to Garrison prior to the plaintiff's first charge. She was given a salary guarantee after her first charge. Although she asserts that the timeliness of her deliveries became worse after filing her charge, there is no evidence that the dispatcher, who was responsible for scheduling deliveries, had any knowledge of her charge. *See* plaintiff depo. at 258-259, 269. There is no evidence that the plaintiff's various coordinators had any knowledge of her EEOC charge.

28

Plaintiff depo. at 259. The plaintiff has failed to demonstrate any causal connection between filing her June 2004 EEOC charge and any adverse employment action, and thus does not set forth a *prima facie* case of retaliation.[22]

Even if the court considered plaintiff's allegations of other salespeople going after her accounts as evidence of adverse employment actions, the defendant asserts these accounts were inactive and thus "fair game."  Therefore, the factual record of this case would require the court to do nothing more than second-guess the defendant's business decisions.  "This kind of inquiry – whether a business decision is wise or nice or accurate – is precluded by *Damon* ..." *Rojas*, 285 F.3d at 1344. *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997) ("a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer").

The court finds no basis on which a reasonable juror could conclude that the defendant retaliated against the plaintiff for complaining of sex discrimination.  As

---

[22]In fact, plaintiff testified in her deposition that "everything was probably the same" before and after she filed her June 2004 EEOC charge.  Plaintiff depo. at 269.  She further explained that "[t]he things that probably got worse was (sic) more verbal things, more made-you-feel-bad kind of things."  Plaintiff depo. at 269.  When questioned further, the plaintiff had no specifics.  Plaintiff depo. at 270.  The plaintiff attempts to now refute this by her Declaration, at ¶ 2, by stating that she meant "equally bad." Accepting that things were "equally bad" before and after her June 2004 EEOC charge, there could be no retaliation based on this charge.

such, the court shall grant the defendant's motion for summary judgment on this claim by separate order.

## CONSTRUCTIVE DISCHARGE

The plaintiff argues that she meets the standard to establish she was constructively discharged because "she had lost many customers, was not making sales, and thus would have no income when her guarantee ran out." Plaintiff's response at 47. To prove constructive discharge, the plaintiff must show much more than lack of success as a salesperson. Rather, she must show "working conditions that were 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.,* 348 F.3d 974, 977 (11th Cir.2003) (citation and internal marks omitted); *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997) (quotation marks and citation omitted). Unequal pay, standing alone, does not constitute a constructive discharge. Fitz., 348 F.3d at 978, citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1077 (5th Cir.1981). Rather, the plaintiff must present substantial evidence of working conditions that were "intolerable." *See, e.g., Hill v. Winn-Dixie Stores, Inc.,* 934 F.2d 1518, 1526-27 (11th Cir.1991). The plaintiff claims these conditions include Hougas taking away the D.R. Horton account, hiring Glisson and refusing to support her. The plaintiff speculates that "Hougas probably expected

30

Beard to quit after he took D.R. Horton.  When she did not, he forced her to resign by denying her the support required for her to even have a chance at success in the difficult commission sales world."  Plaintiff's response at 48.  Thus, according to plaintiff, while Hougas is trying to get the plaintiff to quit, she is given yet another pay guarantee.  The court finds this, in and of itself, contradicts plaintiff's claim of constructive discharge.[23]

The plaintiff presents no evidence that she requested a further guarantee after her third one was to expire, or that she would not have received a further guarantee. Rather, prior to the expiration of her guarantee from defendant, the plaintiff found another job.[24]  The court is of the opinion that the facts of this case, in the light most favorable to the plaintiff, simply do not rise to the level of working conditions that are "intolerable."  The court is of the opinion that the defendant's motion for

---

[23]The plaintiff suggests that she had to obtain her second pay guarantee from Lemons, rather than Hougas.  However, the plaintiff presented no evidence that she approached Hougas with this request and he turned her down.  All the evidence shows is that, for whatever reason, Lemons approved the November 2004 pay guarantee.

[24]Although the plaintiff asserts she did not apply for her position at Garland Wholesale until the day after she left defendant's employ, the evidence demonstrates that she signed paperwork for Garland Wholesale on February 24, 2005.  Plaintiff depo. at 21-22, 284-286; exhibit 10 to plaintiff depo.  The plaintiff alleges she resigned on March 2, 2005.  Complaint, ¶ 21; plaintiff depo. at 282-283.  She signed an employment agreement, dated February 23, 2005, with Garland Wholesale on March 4, 2005.  Exhibit 12 to plaintiff depo.  However, the plaintiff adds that she may have been paid by Garland Wholesale prior to this date.  Plaintiff depo. at 285-286.

31

summary judgment is due to be granted on the plaintiff's constructive discharge claim.

## IV. CONCLUSION

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact on any of her claims sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendant's motion for summary judgment is hereby **GRANTED**.   The plaintiff's claims  are **DISMISSED WITH PREJUDICE**.  Each party is to bear its own costs.

**DONE** and **ORDERED** this the 6th day of April 2006.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE